UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| STATE OF NEVADA,<br><br>                    Plaintiff,<br>    v.<br><br>UNITED STATES; *et al.*,<br><br>                    Defendants. | Case No. 3:18-cv-569-MMD-CBC<br><br>ORDER |

**I.    SUMMARY**

Plaintiff the State of Nevada ("Nevada") challenges the federal government's[1] plan to ship one metric ton of defense plutonium from the Savannah River Site ("SRS") in South Carolina to the Nevada National Security Site ("NNSS"). This plan is part of the Government's larger proposed action articulated in a supplemental analysis. The merits of Nevada's claims are yet to be decided; this order only addresses Nevada's motion for preliminary injunction ("PI Motion") seeking to enjoin any shipment of plutonium from SRS to NNSS until Nevada's claims are decided on the merits.[2] (ECF No. 2.) The Court concludes that Nevada has failed to make the requisite showing of a likelihood of

///

---

[1] In addition to the Department of Energy ("DOE"), Nevada sues the United States Secretary of Energy, Rick Perry, in his official capacity, and the National Nuclear Security Administration ("NNSA") and its administrator, Undersecretary for Nuclear Security, Lisa E. Gordon, in her official capacity. (ECF No. 1 at 4.) These Defendants are collectively referred to as "the Government."

[2] The Court has considered the Government's response (ECF No. 27) and Nevada's reply (ECF No. 34). The Court has also deliberated the arguments the parties presented at an evidentiary hearing on the PI Motion on January 17, 2019 ("the Hearing"). (ECF No. 45.)

irreparable harm in the absence of the requested preliminary injunctive relief and that the balance of equities favors Nevada. The Court thus denies Nevada's PI Motion and declines to enjoin the shipment of plutonium pending a final disposition on the merits.

## II. RELEVANT BACKGROUND

This case stems from an injunction order the United States District Court for the District of South Carolina issued in December 2017 ("Order"). *South Carolina v. United States*, No.: 1:16-cv-00391-JMC, 2017 WL 7691885 (D. S.C. Dec. 20, 2017); *see also South Carolina v. United States*, 907 F.3d 742, 766 (4th Cir. 2018) (upholding the Order). The Order required the Government to remove "not less than one metric ton" of weapons-grade defense plutonium or defense plutonium materials from South Carolina "for storage or disposal elsewhere" by January 1, 2020. *United States*, 2017 WL 7691885, at *5.

The Device Assembly Facility ("DAF") at NNSS, located approximately 65-90 miles northwest of Las Vegas, is the only direct location that, at present, the Government has proposed to receive the plutonium directly from SRS. (ECF No. 1 at 2; ECF No. 27-3 at 12, 16, 21–22; ECF No. 32 at 3.) After the plutonium is transferred to NNSS, it will ultimately be removed and relocated to its final destination at Los Alamos National Laboratory ("LANL") in Los Alamos, New Mexico. (ECF No. 27-3 (DOE/NNSA's Supplement Analysis) at 9, 23.) The shipments of plutonium from SRS to NNSS for staging (or storage) and thereafter to be received at LANL constitutes the Government's proposed action ("Proposed Action") as presented in the DOE's Supplemental Analysis ("SA").[3] (*Id.* at 9, 18; ECF No. 32 at 3.)

Nevada filed suit against the Government contending that the Government's plan to transport and stage the defense plutonium at NNSS will result in increased radiation doses to Nevada citizens and would, in some circumstances, lead to contamination of the lands and the groundwater of the state with radioactive materials. (ECF No. 1 at 6.)

///

---

[3] The SA identifies the Proposed Action as the transportation of one metric ton of plutonium out of South Carolina to National Nuclear Security Administration Production Office ("Pantex Plant") and/or NNSS. (ECF No. 27-3 at 9, 18.)

1 | Nevada asserts that in choosing to relocate the plutonium to NNSS the Government has
2 | failed to adequately comply with the National Environmental Protection Act of 1969
3 | ("NEPA"), 42 U.S.C. 432 *et seq.*, and persists in violation of implementing regulations of
4 | the Council of Environmental Quality, 40 CFR § 1502.9(c)(1), and DOE's own NEPA
5 | regulations, 10 CFR § 1021.314(a), by failing to prepare a draft and final supplemental
6 | environmental impact statement ("EIS") for the Proposed Action. (*Id.* at 4.) Nevada
7 | contends that with this failure the Government deprived it of the opportunity to formally
8 | comment upon safety and environment concerns related to the Proposed Action. (ECF
9 | No. 1 at 5.)

Nevada's PI Motion asks this Court to enjoin the plan to ship the plutonium to NNSS—i.e., preserve the status quo—until this action reaches a final disposition. (ECF No. 2; ECF No. 34 at 5; ECF No. 27-3 at 18 (Proposed Action).) Nevada specifically seeks to enjoin the shipment of the plutonium to NNSS until the Government satisfies the alleged NEPA violations, among other remedies. (ECF No. 1 at 19.)[4]

## III. LEGAL STANDARD

### A. PI Motion Standard

"'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff

///

---

[4] On January 30, 2019, the Government submitted a Notice of New Information ("Notice") which provided a sworn declaration asserting that shipment of one-half metric ton of plutonium to Nevada under the Proposed Plan has been completed (ECF Nos. 1, 1-1). The Notice claims that the shipment was completed prior to November 2018, the month in which Nevada filed this lawsuit. The Court issued a Minute Order the same day directing the parties to file status reports regarding whether the Notice renders the PI Motion moot. (ECF No. 57.) In its status report, the Government contends the action is moot and provides that no further shipments from SRS will be made to NNSS as part of the Proposed Action. (ECF No, 58 at 2.) Nevada argues that the Notice does not moot the PI Motion. (ECF No. 59 at 3.) In light of the parties' disagreement as to mootness and the Government's sudden revelation, the Court grants Nevada's request that the Court rule on the PI Motion.

must satisfy four requirements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20.[5]

### B. Judicial Review of NEPA Claims

NEPA does not provide a private right of action. *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006). Thus, "[t]he judicial review provision of the [Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq*] is the vehicle" for challenging an agency's decision under NEPA. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 942 (9th Cir. 2006); *Gros Ventre Tribe*, 469 F.3d at 814; see *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990) (judicial review of agency action proceeds under the APA where the statute at issue, NEPA, does not provide cause of action).

Under the APA's standard of review, deference is due to the Government's challenged action, unless Nevada shows that DOE's decision not to prepare a supplemental EIS is "arbitrary and capricious." *See, e.g., DOT v. Pub. Citizen*, 541 U.S. 752, 763 (2003) (quoting 5 U.S.C. § 706(2)(A)) (agency's decision not to prepare EIS can be set aside only upon a showing that it was "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law"); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) (requiring plaintiffs to carry the burden); *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (same). This means DOE's decision "need be only a reasonable, not

///

///

///

---

[5]The traditional four-factor test applies where, as here, a plaintiff seeks a preliminary injunction to remedy a NEPA violation. *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 157 (2010) (citing *Winter*, 555 U.S. at 31–33); see also *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1187 (9th Cir. 2011) (citing *Monsanto* and providing "[e]ven in NEPA cases, '[a]n injunction should issue only if the traditional four-factor test is satisfied'"); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent our cases have suggested a lesser standard, they are no longer controlling, or even viable.").

4

the best or most reasonable, decision" to be given deference. *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989) (citation omitted).

**IV.    DISCUSSION**

The Court finds, as the Government argues, that Nevada fails to establish the second and third *Winter* factors—a likelihood of irreparable harm in the absence of preliminary relief (*see* ECF No. 27 at 32–35) and the balance of equities favors the Government (*id.* at 35–37). The Court thus declines to address Nevada's arguments as to the other *Winter* factors.

### A.    Irreparable Harm

As a matter of course, the Court cannot presume irreparable harm; there must be a satisfactory showing. *Monsanto Co.*, 561 U.S. at 156–58 (concluding that a presumption that an injunction is the proper remedy for a NEPA violation except in unusual circumstances is unwarranted—"No such thumb on the scales is warranted"); *Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 545 (1987) (overruling the Ninth Circuit's presumption of irreparable harm and concluding that the Ninth Circuit erred "in directing the issuance of a preliminary injunction"). Allegations of irreparable harm must be supported with actual evidence, and not merely conclusory statements or unsupported allegations. *See, e.g.*, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988) (noting the lack of such evidence and therefore concluding that "liability is too remote and speculative to constitute an irreparable harm meriting preliminary injunctive relief"). Moreover, a plaintiff seeking preliminary injunctive relief must "do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury." *Id.* at 674.

Here, Nevada argues that it would be irreparably harmed without a preliminary injunction to preserve the status quo for the following reasons: (1) absent a preliminary injunction, the NEPA decision-making process would be irreparably harmed because once the plutonium is transported out of South Carolina to NNSS, Nevada will forever lose the ability to formally comment upon the safety and environment concerns as required under

NEPA; (2) the shipments of plutonium could be completed before a decision is reached in this matter, mooting the issues Nevada raises, and allowing the Government, via DOE, to evade compliance with NEPA; and (3) the shipments[6] could create grave harm to Nevada—its lands, environment, and citizens.[7] (ECF No. 2 at 9–10, 12; ECF No. 34 at 17.) The first two arguments appear to overlap and create an umbrella claim of *injury stemming from the decision-making process* whereby (1) Nevada's concrete and particularized claim of injury is that shipments to NNSS will deprive it of the opportunity to comment and (2) there is a general claim of injury based on the claim that the Government would evade NEPA compliance absent injunction. The Court finds that Nevada falls short of establishing irreparable harm warranting an injunction.

### 1. Injury Relating to the NEPA Decision-Making Process

#### a. General Harm to the NEPA Decision-Making Process

The Court is unpersuaded by Nevada's contention that the Government will likely cause irreparable harm to the general NEPA decision-making process by evading NEPA compliance as relating to NNSS.

"NEPA itself does not mandate particular results." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989). As to compliance, "NEPA imposes only procedural requirements to 'ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Winter*, 555 U.S. at 23. In *Winter*, the Supreme Court recognized that "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Id.*

///

---

[6]Nevada also argues cumulative impact of additional shipments of plutonium from SRS to NNSS that Nevada insists is likely to occur in 2022. (ECF No. 34 at 15–16.) The Court finds its most appropriate to limit its discussion on the PI Motion to the removal scheduled for January 2020, which Nevada asserts is the emergency here.

[7]Nevada's arguments seem circular in various ways—for example, many of its arguments going to the merits of the PI Motion, particularly at the Hearing, intersect with considerations of irreparable harm.

6

However, the SA evidences that this is not a case where there is little or no information about prospective environmental harms. Here as in *Winter*, the Government "is not conducting a new type of activity with completely unknown effects on the environment." *Id.* The government is seeking to transport and stage plutonium as it has done for decades. Given these considerations, it is unlikely that a failure to conduct a supplemental EIS as to the shipment to and staging at NNSS will cause irreparable harm to the general NEPA decision-making process absent this Court issuing an injunction here.

### b. Deprivation of Opportunity to Comment

Nevada insists that losing the opportunity to comment due to the Government's alleged circumvention of the NEPA decision-making process *constitutes irreparable harm*. (ECF No. 2 at 9–10; ECF No. 34 at 17.) The Government counters that opportunity to comment is merely procedural harm and therefore cannot support a finding of irreparable harm. (ECF No. 27 at 33.) The Court agrees with the Government.

Even accepting Nevada's claim of "procedural harm" to Nevada,[8] such harm, standing alone, is not imminent threatened harm to satisfy the likelihood of irreparable harm prong. *Amoco* requires that the Court's irreparable harm analysis focus on whether the threat of environmental injury is sufficiently likely under the traditional four factor test, not merely on the existence of a procedural violation or injury. *See Amoco*, 480 U.S. at 544–46. In *Amoco*, the Supreme Court overruled the Ninth Circuit's presumption of irreparable harm. *Id.* at 545–46. There, the Supreme Court concluded that "if [environmental injury] is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment," but the Court found that the claimed environmental injury in the case "was not at all probable." *Id.* at 545.

///

///

---

[8] *See, e.g., Lujan v. Def. of Wildlife*, 504 U.S. 555, 572 & n.7 (1992) (indicating that a failure to undertake *an EIS when required to do so* constitutes procedural injury to those affected by the environmental impacts of the Government's project, but only noting that such failure "*could* impair a separate concrete interest of [the plaintiffs]") (emphasis added).

The decisions Nevada cites to support its contention that procedural harm is sufficient to demonstrate irreparable harm are either unpersuasive or not directly on point. Nevada relies on *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989); *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1056–57 (N.D. Cal. 2010) (applying *Marsh*), and *Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1189–90 (N.D. Cal. 2009). (ECF No. 2 at 9–10; ECF No. 34 at 17.) The Court discusses *Marsh* and *Strawberry Canyon* in turn.

Nevada's reliance on *Marsh*, a case from the First Circuit, for the direct conclusion that the procedural harm in not being afforded the opportunity to comment amounts to irreparable harm is misguided. In *Marsh*, the First Circuit concluded that the harm posed was *more than merely procedural*, but rather is "the added risk to the environment that takes place when the governmental decision makers make up their minds having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Marsh*, 872 F. 2d at 500. The *Marsh* court, however, did not find irreparable harm. The court simply remanded to the district court to decide on the potential irreparable nature of the harm to the environment, including the harm from the NEPA decision making process violation. *Id.* at 504–506.

Even *Marsh*'s conclusion of procedural harm may not extend to this matter, as *Marsh* is factually distinguishable. The First Circuit has particularly noted that in *Marsh* the plaintiffs moved for injunction in the earliest stages of the development of the project at issue, "when NEPA injunctions could implement the statutory purpose in the sense that 'bureaucratic decision makers . . . are less likely to tear down a nearly completed project than a barely started project.'" *Conservation Law Found., Inc. v. Busey*, 79 F. 3d 1250, 1272 (1st Cir. 1996) (explaining and distinguishing *Marsh*). In contrast here, it is undisputed that the Government has been transporting and staging plutonium for decades across the country and Nevada, with prior EISs addressing the matter. Notably, Nevada provides no authority that would support a conclusion that it must be provided an opportunity to comment absent the Government drafting a supplemental EIS. But, even if

this Court was to find procedural harm based on *Marsh*, it is clear that Nevada must nonetheless establish a real threat of environmental harm—that is material harm to the environment that is likely to result from not having the opportunity to comment.[9]

Nevada's reliance on *Strawberry Canyon* begets no different conclusion. While the *Strawberry Canyon* court concluded that "procedural injury is . . . irreparable" injury, that decision is not binding on this Court and its quoted conclusion was unsupported by cited authority. *See* 613 F. Supp. 2d at 1189. Moreover, the *Strawberry Canyon* decision appears to conclude that the procedural injury is equal to the environmental injury at the heart of the discussion on irreparable harm in *Amoco*, discussed *supra*. *See id*. This Court disagrees.

Accordingly, the Court concludes procedural harm, standing alone, cannot support the necessary finding of a likelihood of irreparable harm. The Court will next examine whether other alleged harms to Nevada are more than speculative, i.e., are probable, material, real threats of harm, to satisfy the likelihood of irreparable harm factor.

### 2. Other Alleged Harms to Nevada

Nevada appears to argue that the harm of not being afforded an opportunity to comment is likely to lead to probable irreparable injury to Nevada's environment, among

///

///

///

---

[9]In cases after *Marsh*, the First Circuit has stressed that "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68 (1st Cir. 2004) (citations omitted) ("A preliminary injunction should not issue except to prevent a real threat of harm . . . . A threat that is either unlikely to materialize or purely theoretical will not do."); *see also Food & Water Watch v. U.S. Army Corps of Eng'rs*, 570 F. Supp. 2d 177, 192 (D. Mass. 2008) (recognizing *Marsh*, but nevertheless undertaking an assessment of irreparable harm beyond the harm of NEPA decision-making without comment and concluding that the plaintiff had not demonstrated irreparable harm because "Plaintiff lacks any affidavits from scientists or experts *proving* that the Project presents a *real threat* of irreparable harm to the environment").

other harms. But this claim of other harms must be examined in the context of the Proposed Action and the status quo.

The SA relied on numerous prior EISs,[10] and the Government provides argument primarily based on the following: The Final Complex Transformation Supplemental Programmatic Environmental Impact Statement (SPEIS) drafted in 2008 ("Final Complex Transformation SPEIS"); The Final Surplus Plutonium Disposition Supplemental Environmental Impact Statement (SEIS) drafted in 2015 ("Final Surplus Plutonium Disposition SEIS"); and The Final Site-Wide Environmental Impact Statement for the Continued Operation of the Department of Energy/National Nuclear Security Administration Nevada National Security Site and Off-Site Locations in the State of Nevada drafted in 2013 ("NNSS SWEIS"). (*See* ECF No. 27 at 26–27; ECF No. 27-3 at 14–16.) The Government also relied on the Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes drafted in 1977. (*See* ECF No. 27-3 at 28, 39, 43.)

The SA provides that the plutonium would be "transported from SRS to the [DAF] in DOT-certified shipping containers, or equivalent[,]"[11] and "placed into a vault for staging." (ECF No. 27-3 at 21–22 (SA at 13–14 (Figures 2-2 and Figure 2-3)).) The plutonium would be staged in the same containers used in transport "until transport to LANL for pit production." (*Id.*) The SA showed an example of the customary "DOE-STD-303 container used to store plutonium-bearing materials" that would be used for the plutonium materials here. (*Id.* at 22 (Figure 2-3).) At the Hearing it was undisputed that the

---

[10]The EISs and other relevant documents the Government relied on in preparing the SA are noted at pages 14 through 16 of the SA. (ECF No. 27-3 at 14–16.)

[11]At the Hearing, Nevada took issue with the "or equivalent" statement in the SA, using that statement to contend, without evidence, that the Government could potentially ship the plutonium in containers less safe than the standard containers. (TR at 149, 164.) However, the word "equivalent" would tend to suggest than any alternative container would be as safe as the DOT-certified shipping containers. Furthermore, the Government's only witness, William Harris Walker—Director of the Office of Intergovernmental Affairs at NNSA, indicated that the Government has no intention to use anything other than the customary shipment containers. (ECF No. 27-1 at 2; TR at 148.)

customary container is a double sealed Type-B container that complies with all relevant regulations. (Hearing Transcript, ECF No. 55 ("TR") at 16, 17, 46–47, 118–19, 141.) It was also undisputed that the Government has repeatedly informed Nevada that the transportation of the plutonium would be carried out by the Office of Secure Transportation ("OST") that traditionally conducts the transport of plutonium for DOE. (*see, e.g.*, *id.* at 17.) The SA provides the same. (ECF No. 27-3 at 19 ("The DOE/NNSA Office of Secure Transportation would transport the one metric ton of plutonium between the DOE sites.").)

Furthermore, the SA notes that the "proposed action does not involve new construction or ground disturbing activities" and the proposed activities "would occur in existing facilities where the potential impacts have been analyzed and bounded in various NEPA documents." (ECF No. 27-3 at 19 (referencing the various EISs which are available at pages 14 through 15)); *see also id.* at 28 ("[I]mpacts from transportation on all resource areas are also evaluated. Intentionally destructive acts were analyzed in the following NEPA documents: Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes[12] . . ., the Final Complex Transformation SPEIS . . ., the LANL SWEIS . . ., the NNSS SWEIS . . ., and the Final Surplus Plutonium Disposition SEIS . . . Intentionally destructive acts are discussed on Section 3, Facility Accidents and Intentionally Destructive Acts."); *id.* at 29–30 (discussing utility consumption related to temperature control of staging and repacking at NNSS based on the 2013 NNSS SWEIS);

///

---

[12]In its reply, Nevada contends that this document is irrelevant in part because it is not a *DOE* EIS, having been prepared by the U.S. Nuclear Regulatory Commission and not listed in the SA as an EIS reviewed and relied upon. (ECF No. 34 at 12 n.1.) Nevada also contends that the 2013 NNSS SWEIS is too old to be relied on in the SA for the Proposed Action here because DOE's own regulation, 10 CFR § 1021.330(d), requires DOE to evaluate site-wide NEPA documents at least every five years. (*Id.* at 12–13.) As to the age of the documents, the Court is unpersuaded that the age of the documents makes them inadequate absent otherwise meaningful change. Further, the fact that the U.S. Nuclear Regulatory Commission prepared a document regarding nuclear materials, as opposed to the DOE itself, doesn't clearly undermine the efficacy of the document where, as here, nuclear material is the topic of concern. Moreover, while the Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes was not listed under the list of documents the SA notes it considered (*see* ECF No. 27-3 at 14–16), it was nonetheless referenced throughout the SA (*see id.* at 28, 39, 43).

*id.* at 31–32 (noise impact from transportation to NNSS and summary); *id.* at 32–34 (nonradiological air emissions); *id.* at 35 (considering radiological impacts to public and worker health and concluding that "[p]otential radiological impacts represent a minimal increase from existing analyses in the NNSS SWEIS . . . and the Final Plutonium Surplus SEIS").

Nevada nonetheless argues the prior EISs are inadequate for evaluating the risks to Nevada. (ECF No. 34 at 12–13.) At the Hearing it became apparent that this argument largely rests on Nevada's contention that the prior EISs do not take certain factors into account—particularly the form of plutonium to be shipped to NNSS, the quantity to be shipped in the proposed timeframe—by January 1, 2020, increased population density, construction irregularities, and the duration of storage at NNSS. (*See, e.g.*, TR at 16–17, 66–67, 84, 119–21, 166–67.)

Through expert testimony presented at the Hearing Nevada attempted to bolster its claim that the Government needed to perform a supplemental EIS to better assess the current risks to Nevada based on arguments going to these factors. Nevada's experts testified that the plutonium proposed to be transported to NNSS appears to be of an atypical *form*[13] that has not previously been transported to NNSS and staged at DAF. (*Id.* at 66–67, 69–70, 100–01, 173.) The experts posited that the combination of the form of plutonium and the quantity to be shipped, in the limited time-period for shipment to NNSS, may be disastrous considering increased population density along the likely route of transport and the irregularities of construction in and near the Las Vegas metropolitan area. (*Id.* at 166–67.) Nevada's experts further testified that the DOT-containers for shipment typically only have a life span of 10 years, making it rather dangerous that storage at NNSS, as Nevada argues, would be indefinite. (*Id.* at 84, 119–121, 166–67; *see also* ECF No. 1 at 2 (Nevada contending that storage would be for an indefinite

---

[13]The Government's response represented that the plutonium would be in the form of "pits" (ECF No. 27 at 9, 20–21), however, the Government filed an erratum to correct its response and to clarify that the plutonium "is not in pit form." (ECF No. 41 at 2.)

12

period); ECF No. 27-3 at 19 (noting the "duration of staging at . . . NNSS is currently undefined, but will likely take place for a period of years").)

Nevada's claims of other harms, including environmental injury, are too speculative to rise to the level of the required likelihood of irreparable harm. Nevada seeks to maintain the status quo—meaning keep things as they are in relation to NNSS. However, in general the status quo at NNSS, as elucidated by testimony at the Hearing, historically includes the use of plutonium in testing operations and nuclear materials transferred to NNSS.[14] (TR at 44, 49, 64, 101.) Thus, it is highly hypothetical that shipments of additional plutonium to NNSS and staging there would lead to imminent and immediate harm. In other words, the any potential harm is speculative given the nature of the existing activities at NNSS where the Government has shipped, stored and used plutonium.

Further, the Government repeatedly noted at the Hearing that the form of plutonium and the route of shipment are classified information.[15] (TR at 20–22, 49–50, 69.) While these statements alone do not suffice to negate Nevada's concerns, they do illustrate the speculative nature of the harm. If the form of plutonium and the routes are not known or disclosed, any claim that the plutonium would be shipped in a form that poses more imminent harm than the type that has been previously shipped to NNSS or that the routes would go through more dense areas or areas with construction projects is notional. Moreover, as the Government points out, it has safely shipped larger quantities of plutonium throughout the country and that DOE and NNSA necessarily had to have

///

---

[14]Nevada additionally argues that the Government's decision not to do a supplemental EIS left it unable to assess potential risks considering the noted factors and left it inadequately prepared to address emergencies that could stem from accidents in the transport and staging of the plutonium. The Government responds that any claims regarding the inadequacy of the prior EISs are unjustified and Nevada had the opportunity to comment on those EISs at the time they were drafted but failed to do so. The Government also argues that it previously informed Nevada that the plutonium will leave NNSS for LANL between 2026 and 2027.

[15]This statement takes on new meaning in light of the Government's representation that the shipment was completed before initiation of this action. (ECF No. 56.)

analyzed and did analyze in the relied upon prior EISs the safety of transporting and staging—for relevant time durations, whatever type of plutonium is proposed to be transported to and stored at NNSS. Nevada presented no evidence to undermine the Government's position to show that its claimed harm is not speculative.[16]

Additionally, Nevada's concern regarding the security of the shipment containers for staging at best raises the possibility of harm. Nevada's argument is grounded in part on the contention that the storage of plutonium at NNSS may go beyond 2026/2027, but this is conjecture that the Government would delay moving the plutonium to LANL as stated in the SA. Moreover, the plutonium presumably would be repackaged into other containers thus curbing concerns about the shipping container's lifespan.[17] The Court is persuaded by the Government's position expressed at the Hearing—that the same containers that are safe for shipment, which is a more unsteady activity than storage, also suffices for staging. (TR at 186–87.)

Nevada's claim of irreparable harm to Nevada's lands, environment, and by extension Nevada's citizens, is merely a theoretical possibility at this juncture as Nevada provides no evidence from which this Court may infer a likelihood of any concrete or impending harm. Accordingly, the Court finds that Nevada has failed to establish the

///

///

///

///

///

///

---

[16]The Government did not provide additional expert witnesses at the Hearing. The Court acknowledges that its ability to do so may have been hampered by the ongoing shutdown. Moreover, certain concerns Nevada emphasized at the Hearing were not necessarily elucidated in Nevada's briefing pertaining to the PI Motion. However, the Court's recognition of these possible factors did not affect its decision here.

[17]At minimum, the SA envisions the need to repackage the plutonium at NNSS before shipment to LANL. (See, e.g., ECF 27-3 at 9 (Scope of this Document), 16–18, 19 (Table 2-1).)

requisite likelihood of irreparable harm to merit the exceptional relief of a preliminary injunction to enjoin the shipment of plutonium to NNSS.

### B. Balancing of the Equities

While the Court need not consider the additional *Winter* factors having found that Nevada fails to establish the necessary requirement of likely irreparable harm, the Court notes that the balancing of the equities favors the Government.

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court must then weigh "the hardships of each party against one another." *Id*.

Nevada argues that the balance of equities favor granting an injunction for multiple reasons: (1) the Order specified no particular location, (2) DOE has sufficient time to consider intermediate destinations and comply with the January 1, 2020 removal deadline, and (3) the Order is also conditioned on DOE complying with NEPA. (ECF No. 2 at 10–11.) These reasons do not tip the equities regarding injunction in Nevada's favor however.

While the Order specified no particular location, the Government has chosen to remove the plutonium to NNSS for an interim period and many of the arguments Nevada raises—e.g., related to population density, form of plutonium, the quantity of plutonium in the limited time-period—could conceivably be raised by intermediate destinations. Further, it is debatable that DOE has sufficient time to consider intermediate locations, without protestation from representatives from those locations, and still comply with the January 1, 2020 removal deadline. Moreover, the balance of equities analysis specifically focuses on the possible harm that would result from not issuing an injunction, thus the Court's finding that any harm posed to Nevada is speculative tips the balance firmly in the Government's favor.

The Government would be harmed by further delay in complying with the Order as is. Any failure to comply with the Order would result in the Government violating both the

1 | Order and Congress's statutory requirement whereby removal from SRS appears to be an extension of the achievement of certain production objectives pursuant to 50 U.S.C. § 2566. *United States*, 2017 WL 7691885, at *3 (citing 50 U.S.C. § 2566(b)(6) (("Upon making a determination ... [that there is a substantial and material risk that the MOX production objective will not be achieved by 2012] or [that the MOX production objective has not been achieved after January 1, 2014], the Secretary shall submit to Congress a report on the options for removing from the State of South Carolina an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to the State of South Carolina after April 15, 2002.").

The Court therefore concludes that the hardships posed to the Government in not complying with the Order outweighs the hardships to Nevada based on likely speculative harms. The Court therefore denies Nevada's request for injunction.

**V.     CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

Nevada cannot demonstrate the likelihood of irreparable harm in the absence of preliminary injunctive relief or that the balance of hardships tips in its favor. It is therefore ordered that Nevada's motion for preliminary injunction (ECF No. 2) is denied.

DATED THIS 30th day of January 2019.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE