Aaron D. Ford
*Attorney General*
Daniel P. Nubel (Bar No. 13553)
*Deputy Attorney General*
OFFICE OF THE NEVADA ATTORNEY GENERAL
100 N. Carson Street
Carson City, Nevada 89701
T: 775.684.1225
E. DNubel@ag.nv.gov

James J. Pisanelli., Bar No. 4027
Todd L. Bice, Bar No. 4534
Jordan T. Smith, Bar No. 12097
Emily Buchwald, Bar No. 13442
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
T: 702.214.2100
E. JTS@pisanellibice.com
*Special Deputy Attorneys General*

Martin G. Malsch, Esq.
EGAN, FITZPATRICK, MALSCH & LAWRENCE, PLLC
1776 K Street N.W., Suite 200
Washington, D.C. 20006
T:  (202) 466-3106
E:  mmalsch@nuclearlawyer.com
*Special Deputy Attorneys General*

*Attorneys for the State of Nevada*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| STATE OF NEVADA,<br><br>        Plaintiff,<br><br>             v.<br><br>UNITED STATES; UNITED STATES DEPARTMENT OF ENERGY; RICK PERRY, in his official capacity as Secretary of Energy; NATIONAL NUCLEAR SECURITY ADMINISTRATION; and LISA E. GORDON, in her official capacity as Administrator of the National Nuclear Security Administration and Undersecretary for Nuclear Security,<br><br>        Defendants | Case No.: 3:18-cv-569-MMD-CBC<br><br>**AMENDED COMPLAINT** |

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1

Plaintiff, the State of Nevada ("Nevada," "the State," or "Plaintiff"), by and through its undersigned counsel, hereby files the above-captioned Complaint and alleges as follows:

**NATURE OF THE ACTION**

1.      The Federal Government Defendants secretly shipped one half metric ton of radioactive, weapons-grade plutonium from South Carolina to the Nevada National Security Site ("NNSS") without complying with the National Environmental Policy Act ("NEPA"), the Council on Environmental Quality's implementing regulations, or the Department of Energy's own rules. Defendants intend to indefinitely store a large quantity of dangerous plutonium in unsafe storage conditions and without proper surveillance, at a facility that is less than 65 miles from Las Vegas, the State's population center and economic hub.

2.      Defendants' surreptitious actions significantly affect the quality of the human environment in Nevada. As a result, NEPA mandates that Defendants complete a full Environmental Impact Statement ("EIS") or a supplemental EIS to assess environmental impacts. Defendants initially acknowledged that a comprehensive NEPA "analysis would be required to support any decision to ship the plutonium to an alternate location which could take 2 to 3 years to complete." Defendants admitted that the "process would likely require scoping meetings at potential sites, developing the analysis and drafting the document, providing the draft document for public comment, addressing the comments, revising the document, and publishing the final document and issuing the decision."

3.      However, Defendants did not engage in the EIS procedure before shipping or storing the plutonium in Nevada. Nor did Defendants bother to complete a less comprehensive Environmental Assessment to determine whether it needed to prepare or supplement an EIS.

4.      Instead, Defendants predetermined that South Carolina's plutonium would come to Nevada and then slapped together a truncated and superficial "Supplement Analysis" to justify its decision after the fact.

5.      Unsurprisingly, Defendants' Supplement Analysis does not, as NEPA requires, contain sufficient information to determine whether Defendants should draft a new or supplemental EIS. The Supplement Analysis also neglects to discuss the circumstances that are pertinent to

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

making those determinations. The Supplement Analysis ignores the significance factors set forth in 40 CFR § 1508.27.

6.     The indefinite storage of the South Carolina plutonium is a substantial change from prior actions at NNSS. There are significant new circumstances and information relevant to environmental concerns that Defendants should have evaluated but did not consider in their haste to transport the plutonium to Nevada. Indeed, Defendants have never evaluated the environmental consequences of these actions at NNSS.

7.     Defendants have never used—or analyzed—NNSS as an indefinite "staging" site for weapons-grade plutonium. Defendants' definition of "staging" is clear that "staging does not include maintaining material with no reasonable expectation of use in the foreseeable future." Defendants' previous NEPA evaluations have only reviewed the effects of transferring special nuclear material to and from other locations to NNSS for storage on a short-term basis until needed in a test, experiment, or other activity on site. Yet under the Supplement Analysis, there is no reasonable expectation of using the South Carolina plutonium at NNSS in the foreseeable future.

8.     On the contrary, the South Carolina plutonium will just sit at the Device Assembly Facility ("DAF") at NNSS while emitting radiation onto neighboring State property and exposing Nevada's natural resources, workers, and public to radiological contamination. The manner in which Defendants are operating NNSS with regard to the indefinite storage of the South Carolina plutonium constitutes an actionable nuisance.

9.     Defendants' indefinite storage of South Carolina plutonium and NEPA violations have inflicted serious and irreparable injuries on Nevada. The long-term storage of this plutonium has exposed—and will continue to expose—Nevada's property, lands, water, air, and citizens to greater radiological pollution and increased risk of ecological and economic catastrophe. Nevada has a sovereign interest in guarding its property, environment, and public from irreversible damage as well as protecting itself from the Federal Government's disregard for its health and safety.

10.     Nevada seeks declaratory relief that Defendants have violated NEPA, the Council on Environmental Quality regulations, and the Department of Energy's environmental regulations.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

3

11.     Nevada is entitled to preliminary and permanent injunctive relief (1) abating the radiological nuisance; (2) preventing all plutonium shipments from South Carolina; and (3) ordering Defendants to remove the one-half metric ton that Defendants have already covertly shipped into Nevada.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws and regulations of the United States as well as 42 U.S.C. § 2210 and the federal common law of nuisance. This Court also has jurisdiction to compel an officer of the United States or a federal agency to perform his or her duty pursuant to 28 U.S.C. § 1361.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(e) because the United States, its agencies, and its officers in their official capacities are Defendants; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; the property that is the subject of the action is situated in this District; and Plaintiff resides in this District.

14.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-2202, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, and 28 U.S.C. §1361.

## PARTIES

15.     Plaintiff State of Nevada is a sovereign State of the United States. It holds the land and water resources within its borders in trust for the benefit of the public and People of the State. NRS 321.597; NRS 533.025; NRS 534.020.

16.     Defendant United States is the Federal Government of the United States of America, and includes all of its federal corporations, departments, agencies, commissions, boards, instrumentalities, entities, and officials acting in their official capacities.

17.     Defendant United States Department of Energy ("DOE") is an agency of the Federal Government. It oversees, directs, and controls the acts and omissions at issue in this litigation.

18.     Defendant National Nuclear Security Administration ("NNSA") is a semi-autonomous agency within DOE and is responsible for, among other things, the administration of federal programs concerning the production of nuclear materials for the weapons program, the

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

4

production of nuclear weapons, and the transportation and storage of nuclear and radioactive materials at issue in this litigation

19.     Defendant Rick Perry is the United States Secretary of Energy and is sued in his official capacity. The Secretary of Energy is responsible for the administration, operations, and activities of DOE, including the administration of programs related to NNSA and the acts and omissions at issue in this litigation.

20.     Defendant Lisa E. Gordon is the Administrator of NNSA and the Under Secretary for Nuclear Security at DOE. She is sued in her official capacity. The Administrator is responsible for the administration, operations, and activities of NNSA, including the acts and omissions at issue in this litigation.

## GENERAL ALLEGATIONS

**A.     The Federal Government's Plutonium Problem.**

21.     Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

22.     In the early 2000s, DOE created a plan to reduce the Nation's stockpile of defense plutonium by converting thirty-four metric tons into commercially usable mixed-oxide ("MOX") fuel. To accomplish this, DOE needed a new MOX facility and a new location to store plutonium from a closing Colorado site.

23.     South Carolina's Savannah River Site ("SRS") was selected as the planned location for the new facility and Colorado's plutonium.

24.     But the State of South Carolina had concerns. It worried about "the potential adverse impact of transferring additional nuclear material into the State" and feared that "DOE's insufficient financial and organizational commitment to defense plutonium disposition risked making South Carolina a 'permanent repository' for weapons-grade plutonium."[1]

25.     Despite these risks, South Carolina negotiated an agreement with DOE, which Congress ultimately memorialized in the National Defense Authorization Act for Fiscal Year 2003.[2]

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

---

[1]     *South Carolina v. United States*, 907 F.3d 742, 746 (4th Cir. 2018).

[2]     *Id.* at 746-47.

The Act funded the new MOX facility but required DOE to remove at least one metric ton of defense plutonium from South Carolina within two years if DOE missed a January 1, 2009 MOX production deadline.[3] 50 U.S.C. § 2566(c).

**B.    DOE Misses the MOX Production Deadline.**

26.    DOE was repeatedly behind schedule. As a result, Congress amended and extended the statutory MOX production deadline several times. The most recent iteration of the relevant statute provides:

> If the MOX production objective is not achieved as of January 1, 2014, the Secretary shall, *consistent with the National Environmental Policy Act of 1969* and other applicable laws, remove from the State of South Carolina, *for storage or disposal elsewhere—*
>
> (1) not later than January 1, 2016, not less than 1 metric ton of defense plutonium or defense plutonium materials; and
>
> (2) not later than January 1, 2022, an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to the Savannah River Site between April 15, 2002, and January 1, 2022, but not processed by the MOX facility.

50 U.S.C. § 2566(c) (emphasis added).

27.    Upon information and belief, there is approximately eleven metric tons of plutonium still in South Carolina that Defendants must remove by January 1, 2022. Nevada is the likely target for this remaining plutonium.

28.    By the fall of 2015, it was clear that DOE would miss the statutory MOX production deadline and fail to remove one metric ton of plutonium by January 1, 2016.

29.    When the deadline lapsed, South Carolina sued in federal court and requested, among other things, an injunction requiring DOE to immediately remove one metric ton of plutonium from the state. *South Carolina v. United States*, 221 F. Supp. 3d 684 (D. S.C. 2016).

30.    Eventually, the District of South Carolina granted the state's motion for summary judgment. The court found that DOE did not meet the MOX production objective and did not timely remove the necessary plutonium. *South Carolina v. United States*, 243 F. Supp. 3d 673, 695

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

---

[3]    *Id.* at 747.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

(D. S.C. 2017). It held that DOE's "failure to remove one metric ton of defense plutonium from South Carolina by the January 1, 2016 deadline constitutes agency action unlawfully withheld for purposes of § 706(1)."

31.    The South Carolina court did not immediately order DOE to remove the plutonium because "such an order must consider the work that is necessary to accomplish the removal consistently with NEPA and other applicable laws." The court requested additional briefing on proposed removal deadlines and schedules to help the court fashion its injunctive order.

**C.    DOE Admits That It Is Impossible to Comply with NEPA and Safely Ship the South Carolina Plutonium Before 2025.**

32.    In its later briefing, South Carolina urged the court to impose a two-year removal deadline. *See South Carolina v. United States*, No. 1:16-CV-00391-JMC, 2017 WL 7691885, at *2 (D. S.C. Dec. 20, 2017).

33.    DOE relied on a declaration from Henry Allen Gunter ("Gunter"), the Plutonium Program Manager and Senior Technical Advisor to the Assistant Manager for Nuclear Materials Stabilization at SRS, to argue that the court should set only a target or estimated date for removal.

34.    Gunter described the limitations that would prevent DOE from safely removing one metric ton before the year 2025. Gunter attested that "[n]o place exists today, other than [the Savannah River Site], with the required capacity, security, safety analysis, and surveillance program to receive and store any significant amount of this plutonium in the form and packaging configuration as it exists today."

35.    In other words, NNSS did not—and does not—have the requisite facilities or capabilities to indefinitely store the South Carolina plutonium.

36.    Gunter declared that surveillance capabilities are particularly important because DOE has observed corrosion in some containers.

37.    Gunter predicted "[i]t would take months" to analyze other facilities' need for upgraded capacity, security, and safety measures. Gunter estimated it would take up to eighteen months to complete the safety analysis necessary to transfer one metric ton of plutonium from South Carolina. Once DOE finished the safety evaluation, those facilities would likely require

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

modifications or new infrastructure, which "would cost tens of millions of dollars and take years to complete."

38.     Gunter swore that the transportation and staging process will expose workers "to significant levels of radiation." He continued, "additional *unnecessary* exposure would be required of personnel at the alternative storage facility to handle and ultimately dispose of this plutonium." When repacking the plutonium at NNSS, personnel will receive a "significant" and "needless" radiation dose.

39.     Gunter quantified the additional unnecessary exposure. He opined that "individual operations and radiation control personnel would receive a dose equivalent to 100-200 chest X-rays … *every year for three years*."

40.     Gunter erroneously states that "a chest x-ray is 1 millirem (mrem)." But it is commonly accepted that a chest x-ray provides 10 millirems of radiation. For instance, according to Nuclear Regulatory Commission, a chest x-ray is approximately 10 millirems of radiation. https://www.nrc.gov/about-nrc/radiation/around-us/doses-daily-lives.html.

41.     Therefore, according to Gunter, individuals will be exposed to 1,000 to 2,000 millirems of radiation from the South Carolina plutonium every year for three years. These amounts are in addition to exposure from other preexisting NNSS operations. Combined, these totals exceed allowable amounts of radiation exposure.

42.     Even if suitable facilities already existed, DOE, through Gunter, admitted that NEPA "analysis would be required to support any decision to ship the plutonium to an alternate location which could take 2 to 3 years to complete."

43.     Gunter projected that bringing the plutonium shipments into compliance with NEPA "would likely require scoping meetings at potential sites, developing the analysis and drafting the document, providing the draft document for public comment, addressing the comments, revising the document, and publishing the final document and issuing the decisions."

44.     In Gunter's opinion, "[i]t would take approximately five years to prepare for repackaging, repackage, and ship one metric ton of plutonium to an alternate site for interim storage." The five-year timeframe was "in addition to the time needed to identify an alternative

location, *comply with the NEPA process*, and fund and construct facility modifications or new facilities." DOE simply could not fully vet the environmental impacts at the new storage site and safely transport the plutonium before 2025.

45.     Defendants admitted to the court that "it is *impossible* for Defendants to remove one metric ton of defense plutonium from South Carolina *without violating NEPA and other laws, and without posing a significant risk to Defendants' employees, to the environment, and to national security.*"

46.     The District of South Carolina was unpersuaded. The court entered an injunction mandating that, by January 1, 2020, "the Secretary of Energy shall, *consistent with [NEPA] and other applicable laws*, remove from the State of South Carolina, for storage or disposal elsewhere, not less than one metric ton of defense plutonium or defense plutonium materials, as defined by 50 U.S.C. § 2566." *South Carolina v. United States*, No. 1:16-CV-00391-JMC, 2017 WL 7691885, at *5 (D. S.C. Dec. 20, 2017) (emphasis added).

47.     DOE appealed to the Fourth Circuit and again asserted that "the removal of not less than a metric ton of defense plutonium from South Carolina within two years *is simply impossible if DOE also complies with NEPA* and the applicable regulations . . . ." *South Carolina v. United States*, 907 F.3d 742, 764 (4th Cir. 2018) (emphasis added). The Fourth Circuit affirmed.

48.     Impossible lasted only eight months. Faced with yet another deadline to remove plutonium from South Carolina—this time immediately enforceable with contempt—Defendants unilaterally "repurposed" certain plutonium that was designated for MOX down blending at SRS as "suitable for weapons program use." Most of the surplus material at SRS is not suitable for weapons program use.

49.     Defendants admitted to the South Carolina court that there were "drawbacks" to "repurposing" the plutonium so they could comply with the injunction. "The material is safe and secure in its present location … shipping the material to an interim staging location increases costs to the government, *increases radiation exposure to personnel as described in the Gunter Declaration paragraphs 31, 32, and 34; and involves some additional safety and security risks.*"

50.     Nonetheless, Defendants "repurposed" the plutonium in an attempt to fit the material within prior NEPA analyses and documentation. Defendants' sleight of hand allowed them to crank out a so-called NEPA "analysis" just eight months after the injunction.

51.     Defendants identified the Device Assembly Facility at NNSS as one of the hosts for South Carolina's plutonium.

**D.     Nevada Acts to Protect Itself But Is Forced to Sue.**

52.     Nevada learned about the Supplement Analysis and Defendants' intent to forget Nevada at the end of August 2018. Then-Governor Sandoval called Secretary of Energy Rick Perry on September 7, 2018, and expressed Nevada's significant concerns about the plutonium shipments. Governor Sandoval protested the Supplement Analysis's adequacy, including the missing timeline for storage and removal.

53.     The state and federal governments engaged in follow up discussions and letters, culminating in a Washington, D.C. meeting on October 30, 2018. At the meeting, Nevada's representatives reiterated the problems with the Supplement Analysis, especially that this proposed new activity is outside the scope of previous DOE environmental impact statements and has no specific timeline. But the meeting did not solve Nevada's concerns.

54.     In November, Nevada wrote one last letter to DOE reiterating the Supplement Analysis's deficiencies. Like South Carolina years before, Nevada demanded certain information and assurances to protect the safety and security of its citizens and environment. But unlike South Carolina, DOE refused to give them.

55.     Left with no other options, Nevada sued on November 30, 2018, and moved for a preliminary injunction under the Administrative Procedure Act and NEPA. The District Court denied Nevada's Motion for Preliminary Injunction, Nevada appealed, and the Ninth Circuit dismissed the appeal as moot because, unbeknownst to Nevada, the shipments are allegedly complete.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

**E.      DOE Discloses That It Misled Nevada and the District Court About the Plutonium Shipment's Status.**

56.      On the same day that the District Court denied Nevada's preliminary injunction, Defendants made a disturbing disclosure. Defendants filed a "Notice of New Information" with a declaration from Bruce Diamond, the general counsel for the National Nuclear Security Administration. Diamond alleged that "[a]fter further review of the unusual circumstances surrounding the shipment of plutonium to Nevada … [DOE] determined that certain information relevant to the Nevada litigation is now declassified and it may now provide additional information to the Court and the parties." (ECF No. 56-1.)

57.      Diamond revealed that DOE had already "completed all shipment of plutonium (approximately ½ metric ton) to Nevada." DOE still refused to disclose the precise date of the shipment but it represented that it "was done before November 2018, prior to the initiation of the litigation." (*Id.*)

58.      Given the purported timing, DOE completed the shipment in the middle of Nevada's good-faith discussions and before (or during) the Nevada delegation's meeting in Washington, D.C.—all while DOE intentionally left Nevada in the dark. It is clear that the meeting was a charade. DOE shipped a half ton of plutonium with undisputed radiological effects near Las Vegas without warning state officials or emergency responders, even those with appropriate security clearances. Defendants admitted that they did not consider the possibility that Nevada officials with the appropriate security clearances could be given advance notice of the shipment.

59.      Later, Defendants submitted another Declaration from Bruce Diamond stating that "[n]o plutonium will be shipped to [NNSS], or elsewhere in Nevada, from the Pantex Plant, in Carson City, Texas as part of the activity analyzed in the [Supplement Analysis]." (ECF No. 74-1.)

60.      On August 7, 2019, Defendants informed Nevada that the ordered removal of plutonium from South Carolina was complete. Defendant Gordon submitted an attestation to the South Carolina court certifying that Defendants have complied with the injunction.

61.      Nevada now seeks, among other remedies, a permanent injunction preventing further plutonium shipments from South Carolina to NNSS under the Supplement Analysis and an

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

order requiring Defendants to remove the half metric ton of plutonium currently being staged at NNSS.

**F.     NEPA**

62.     NEPA requires federal agencies to complete an "Environmental Impact Statement" ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

63.     If it is unclear whether an EIS is necessary, the agency is obliged to complete an environmental assessment ("EA"). *See* 40 CFR § 1501.3; 40 CFR § 1501.4(b); 40 CFR § 1508.9. An environmental assessment "means a concise public document … that serves to (1) [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; (2) [a]id an agency's compliance with the Act when no environmental impact statement is necessary; (3) [f]acilitate preparation of a statement when one is necessary." 40 CFR § 1508.9(a). An EA shall discuss the need for the proposal, alternatives, the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted. 40 CFR § 1508.9(b).

64.     An agency is required to prepare a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR § 1502.9(c)(1).

65.     DOE's NEPA regulations contain a similar requirement. 10 CFR § 1021.314(a) states: "DOE shall prepare a supplemental EIS if there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns, as discussed in 40 CFR 1502.9(c)(1)."

66.     In determining whether an environmental impact is "significant" or "significantly affects the environment," the Council on Environmental Quality regulation 40 CFR § 1508.27 requires agencies to consider both the "context" and the "intensity" of the potential impact of the proposed action.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

67. "Context" "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant."

68. "Intensity" "refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action." Agencies must consider ten "intensity" factors:

a. Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

b. The degree to which the proposed action affects public health or safety.

c. Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

d. The degree to which the effects on the quality of the human environment are likely to be highly controversial.

e. The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

f. The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

g. Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

h. The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

1    i.    The degree to which the action may adversely affect an endangered or

2    threatened species or its habitat that has been determined to be critical under the Endangered

3    Species Act of 1973.

4    j.    Whether the action threatens a violation of Federal, State, or local law or

5    requirements imposed for the protection of the environment.

6    69.    NEPA requires agencies to complete an EA if it is uncertain or unclear whether a

7    supplement EIS is necessary. *See* 40 CFR § 1501.4(b); 40 CFR § 1508.9.

8    70.    DOE's regulations contain a similar requirement that purports to supplant the EA

9    process. 10 CFR § 1021.314(c) states that "[w]hen it is unclear whether or not an EIS supplement

10   is required, DOE shall prepare a Supplement Analysis." Like an EA, the Supplement Analysis shall

11   discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS,

12   pursuant to 40 CFR § 1502.9(c). It "shall contain sufficient information for DOE to determine

13   whether: (i) [a]n existing EIS should be supplemented; (ii) [a] new EIS should be prepared; or

14   (iii) [n]o further NEPA documentation is required."

15   71.    An EA must discuss the "significantly" factors and sub-factors in 40 CFR § 1508.27

16   to properly determine whether the "new circumstances or information" meets the "significance

17   threshold" that warrants a supplemental EIS.

18   72.    If lawful, a supplement analysis must also analyze each of the "significantly" factors

19   and subfactors in 40 CFR § 1508.27 to determine whether the "new circumstances or information"

20   meets the "significance threshold" that warrants a supplemental EIS under 40 CFR § 1502.9(c)(1)

21   and 10 CFR § 1021.314.

22   **G.    The Supplement Analysis and Its Deficiencies.**

23   73.    Nevada hereby repeats, realleges, and incorporates all of the allegations contained

24   in the preceding Paragraphs as though fully set forth herein.

25   74.    In July 2018, Defendants released a supplement analysis entitled *Supplement*

26   *Analysis for the Removal of One Metric Ton of Plutonium from the State of South Carolina to*

27   *Nevada, Texas, and New Mexico* (DOE/EIS-0236-S4-SA-01) (July 2018) (hereinafter "SA").

28

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

75.     The SA acknowledges that it was "unclear" whether Defendants have previously examined the environmental consequences of their proposed activity. It states "[t]his supplement analysis was prepared in accordance with the [DOE] regulations implementing NEPA that require that '[when] it is unclear whether or not an EIS supplement is required, DOE shall prepare a Supplement Analysis [that] shall discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS pursuant to 40 CFR 1502.9(c)' (10 CFR 1021.314)."

76.     Defendants explained that "DOE/NNSA has prepared this supplement analysis to determine whether (a) an existing environmental impact statement should be supplemented, (b) a [NEPA] document should be prepared, or (c) that no further NEPA documentation is required as the proposed action has been adequately analyzed in existing NEPA documents and record of decisions."

77.     Defendants did not conduct any new NEPA evaluation for the environmental consequences of transporting or storing the South Carolina plutonium in Nevada or NNSS. Rather, Defendants relied on, reviewed, or "tiered" from prior documentation, some of which are more than a decade old.

78.     Defendants concluded that "[b]ased on this review… there are no substantial changes in the proposed action that are relevant to environmental concerns or significant new circumstances or information relevant to environmental concerns that would supplement or require a new environmental analysis."

79.     Defendants additionally "determined that the proposed action does not constitute a substantial change from actions previously analyzed" in earlier NEPA documents.

80.     The SA stated these results after Defendants already predetermined to ship South Carolina's plutonium to NNSS and indefinitely stage it at the DAF. Defendants' NEPA analysis was conducted in bad faith.

81.     The SA and Defendants' transportation and indefinite staging of the plutonium from South Carolina constitute "final agency" action under the APA.

**1.     Defendants' failure to discuss circumstances or sufficient information pertinent to deciding whether there are substantial changes to the Proposal.**

82.     Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

83.     The SA defines the "Proposed Action" as "meet[ing] the [South Carolina injunction] Order by transporting one metric ton of plutonium out of South Carolina. The plutonium would be transported to [NNSA] Production Office (hereafter referred to as Pantex Plant or Pantex) and/or [NNSS] for staging and then to Los Alamos National Laboratory (LANL) for use in pit production, serving a national security mission. Shipments between Pantex and NNSS may occur if needed in the implementation of this proposed action."

84.     The plutonium will be staged at NNSS at the Device Assembly Facility ("DAF"). The DAF at NNSS is a multi-structure facility where special nuclear material is "staged before transport to an experiment site."

85.     According to the SA, Defendants will use the DAF for a "[N]uclear material staging area." Defendants will use the area "for unloading shipments from SRS and loading DOT-certified shipping containers, or equivalents, into trucks for transport to LANL. Shipments between Pantex and NNSS may occur."

86.     Under the SA, the "staging" or storing at NNSS is indefinite. The SA states "[t]he duration of staging at … NNSS is currently undefined, but will likely take place for a period of years." The SA does not give a timetable for removal from NNSS.

87.     Defendants will not use the South Carolina plutonium in any experiments or tests while it is staged at the DAF. There is no reasonable expectation that the plutonium will be used in the foreseeable future at NNSS.

88.     The plutonium will be used, if at all, at LANL for pit production "after it is placed in the interim staging vault." But there is no foreseeable timeframe in the SA for the pit production at LANL.

89.     The indeterminate transportation from NNSS to LANL alone will occur over an unknown period of years.

90.     Defendants' indefinite staging of South Carolina plutonium at the DAF without any actual use of this plutonium at NNSS is a substantial change from Defendants' previously examined actions at NNSS and the DAF. No prior NEPA documents have analyzed the environmental impact of prolonged and indefinite storage of the South Carolina plutonium or its exact equivalent at NNSS.

91.     Notably, Defendants' *Final Site-Wide Environmental Impact Statement for the Continued Operation of the Department of Energy/National Nuclear Security Administration Nevada National Security Site and Off-Site Locations in the State of Nevada* (DOE/EIS-0426) (Feb. 2013) (hereinafter "2013 SWEIS")—on which the SA relies—did not examine the environmental impacts of indefinite plutonium staging at NNSS or the DAF.

92.     The 2013 SWEIS evaluated "staging" but defined it as "mean[ing] to maintain programmatic material, such as nuclear devices, SNM [special nuclear material], or other materials in a safe and secure manner until needed for a test, experiment, or other activity. *Staging does not include maintaining material with no reasonable expectation of use in the foreseeable future*." (at 3-15; 3-34; 3-48) (emphasis added).

93.     The 2013 SWEIS described Defendants' Preferred Alternative course of action as "transfer[ring] special nuclear materials, including nuclear weapons pits, to and from other parts of the DOE complex for staging *and use in experiments at the NNSS*." (3-53) (emphasis added).

94.     Defendants' 2014 Record of Decision adopted the 2013 SWEIS's Preferred Alternative. 79 Fed. Reg. 78421-01.  The 2014 Record of Decision states that Defendants will "transfer special nuclear material, including nuclear weapons pits, to and from other locations in the DOE/NNSA complex for staging *and use in experiments at the NNSS*." *Id*. at 78423.

95.     Neither the 2013 SWEIS, the 2014 Record of Decision, nor any other NEPA document has analyzed the environmental consequences of staging this type or amount of plutonium "with no reasonable expectation of use in the foreseeable future" at NNSS or the DAF.

96.     The unstudied environmental effects of indefinite storage at NNSS are relevant to environmental concerns because the staging will increase and prolong radiological exposure to Nevada's atmosphere, air, environment, lands, plants, groundwater, State employees, workers, and

public. The radiation causes direct injury to Nevada's state-owned property and invades Nevada's sovereign interests as a State, its quasi-sovereign interests, and its *parens patriae* interests. The increased radiation from indefinite storage also intolerably increases the risk of environmental harm and the risk of harm from accident, intentional sabotage, or natural disaster.

97.     Long-term, indefinite staging of this plutonium at NNSS and the DAF is a substantial change to the proposal and the operations status quo that is pertinent and relevant to environmental concerns. Therefore, NEPA required Defendants to complete a new or supplemental EIS. Furthermore, because indefinite storage of this plutonium at NNSS is a substantial change, it creates pertinent and significant new circumstances or information relevant to environmental concerns.

98.     Additionally, the largest release of plutonium analyzed in the 2013 SWEIS involved 5 kilograms (11 pounds) of plutonium-equivalent material. By contrast, the amount of plutonium evaluated under the proposed action in the SA is 1,000 kilograms (one metric ton or 2205 pounds). Thus, the SA proposed action constitutes a nearly 20,000% increase from the largest plutonium release analyzed in the 2013 SWEIS accident scenarios. The quantity of plutonium proposed in the SA represents a substantial change to the amount evaluated in the 2013 SWEIS release analysis and a significant new circumstance or information from plutonium storage analyzed in the 2013 SWEIS.

99.     The SA does not mention or consider the substantial change in the proposal or the significant new circumstances and information. Therefore, the SA does not discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS and does not contain sufficient information for DOE to determine whether an (i) existing EIS should be supplemented; (ii) a new EIS should be prepared; or (iii) whether no further NEPA documentation is required. 10 CFR § 1021.314(c).

> **2.      Defendants' failure to discuss circumstances or sufficient information pertinent to deciding whether there is significant new circumstances or information relevant to environmental concerns.**

100.     Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

101.    There are significant new circumstances or information relevant to environmental concerns that Defendants have not analyzed in prior NEPA documents and failed to consider or evaluate in the SA. Further, the SA does not discuss these circumstances that are pertinent to deciding whether to prepare a new or supplemental EIS, and the SA fails to contain sufficient information related to these significant new circumstances and information. 10 CFR § 1021.314.

102.    The SA does not disclose, discuss, consider, or examine the specific type or form of plutonium that will be transported or indefinitely stored at NNSS.

103.    Plutonium is a heavy metal and therefore toxic to humans. Plutonium-239 (Pu-239) is a radioisotope of plutonium with a half-life of 24,100 years. It decays by emitting an alpha particle (a helium atom). Alpha particles can be dangerous when they directly impact cells in the human body via ingestion or inhalation. Inhalation of Pu-239 particles of about 10 microns is particularly risky. Particles of this size can be inhaled and deposited in the lung—allowing the alpha particles to directly impact lung cells. The deposition of alpha emitting Pu-239 particles in the lung can raise the risk of cancer in an individual; the level of risk is increased with increased exposure. An additional radiological risk results from the Plutonium-240 (half-life 6,600 years) which is almost always present in weapons-grade plutonium, usually representing about 5.8 percent of the total plutonium present, along with 93.8 percent Plutonium-239, and about 0.4 percent other plutonium isotopes. The Plutonium-240, unlike Plutonium-239, is a major source of penetrating neutrons and causes radiation exposures to humans during normal transportation and storage operations, as well as exposures resulting from accidents and sabotage events.

104.    Pu-239 is a fissile material that can fission and release large amounts of energy. Pu-239 metal is used in the fabrication of nuclear weapon "pits." A pit is the component of the nuclear weapon that is imploded by conventional explosives to a super-critical mass and then bombarded by neutrons to create the huge release of energy and an explosion. In thermonuclear weapons, this energy is used to drive the explosion of a secondary pit—made of highly-enriched uranium—and an even larger release of energy and explosion. Pu-239 metal particles or tailings (from machining) can ignite in the presence of moist air. There have been two fires at the Rocky

Flats Plant outside Denver, Colorado—which made Pu-239 pits—resulting from finely divided Pu-239 particles. The fires resulted in a release of Pu 239 into the environment.

105.    Knowing the form of the plutonium is crucial and relevant to environmental concerns because some forms are more unstable, risky, and dangerous than others. Different forms of plutonium have varying radiological properties and will have varying environmental consequences and risks. Upon information and belief, the environmental consequences and risks of the specific type and form of this South Carolina plutonium as well as the proposed quantities have never been evaluated for indefinite staging at NNSS.

106.    After initially claiming the information was "classified," and then incorrectly disclosing during this litigation that the plutonium was in "pit form," Defendants later revealed for the first time in their Ninth Circuit Answering Brief that the plutonium is "in solid metal form." Defendants acknowledged that plutonium in oxide powder form, for example, poses different concerns and risks than plutonium in different forms. Defendants' belated disclosures about the form of the plutonium demonstrates that the type of plutonium is pertinent and a significant new circumstance or information relevant to environmental concerns that should have been disclosed and analyzed in the SA.

107.    The SA fails to discuss, examine, or consider pertinent and significant new circumstances and information related to the surveillance and storage conditions of the plutonium at the DAF in NNSS.

108.    The SA discloses that the plutonium will be packaged in South Carolina in "3013 containers in accordance with DOE-STD-3013, *Stabilization, Packaging and Storage of Plutonium-Bearing Materials* (DOE 2012b)" and then placed in "model 9975-96 shipping packages, or equivalent" before shipping to NNSS. The model 9975-96 package consists of an outer 35-gallon stainless-steel drum and the 3013 container is placed inside.

109.    The SA specifies that "[u]p to one metric ton of plutonium would be transported from SRS [in South Carolina] to the Device Assembly Facility in DOT-certified shipping containers, or equivalent. These containers would be placed into a vault for staging. The plutonium would be staged until transported to LANL for pit production. Prior to transport to LANL, these

containers would be opened and assessed for integrity and material accountability. After the containers are assessed, each would be repackaged into a certified shipping container. After repackaging, the DOT-certified shipping containers … would be transported from NNSS to LNL over a period of years."

110.    Upon information and belief, Defendants have never before indefinitely staged plutonium at NNSS in 3013 containers. Defendants have not analyzed this activity in any previous EIS or NEPA document as it relates to NNSS. The storage of plutonium in 3013 containers is a highly unique defense activity. For that reason, DOE maintains a specific standard for the stabilization, packaging, and storage of these containers. See DOE-STD-3013-2018 (the "DOE 3013 Standard").

111.    The DOE 3013 Standard sets out the minimal surveillance procedures required to maintain 3013 containers. One requirement of the DOE 3013 Standard is that destructive examinations be performed on random 3013 containers each year. This is particularly important because in recent years "destructive examinations have provided evidence that corrosion events occur within the 3013 container." See DOE-STD-3013-2018 at A-4.

112.    Defendants will not conduct destructive testing at NNSS. The SA provides that the "containers would be opened and assessed for integrity and material accountability" "prior to transport to LANL." Thus, Defendants will not be in compliance with the DOE 3013 Standard and will not be able to discover or remedy any corrosion.

113.    The failure to properly store, surveil, and conduct destructive testing is relevant to environmental concerns because improper storage and undetected corrosion will increase and prolong radiological exposure to Nevada's atmosphere, air, environment, lands, plants, groundwater, State employees, workers, and public. The radiation causes direct injury to Nevada's state-owned property and invades Nevada's sovereign interests as a State, its quasi-sovereign interests, and its *parens patriae* interests. The improper storage, surveillance, and testing increases the risk of environmental harm and the risk of harm from accident, intentional sabotage, or natural disaster.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

21

114.    The lack of a DOE 3013 Standard compliant surveillance program at NNSS stands in stark contrast to the surveillance and testing at SRS. The SA highlights that the "3013 containers undergo routine surveillance at SRS to ensure packaging and storage conditions do not impact containment of nuclear materials." There is no similar statement for NNSS.

115.    The Declaration of DOE's employee, Gunter, provides even more pertinent and significant new information and circumstances about surveillance programs and storage conditions around Defendants' nuclear complex.

116.    Gunter declared that "[n]o place exists today, other than [the Savannah River Site], with the required capacity, security, safety analysis, and surveillance program to receive and store any significant amount of this plutonium in the form and packaging configuration as it exists today." Gunter also noted the importance of the destructive exams, stating that corrosion "has been seen in some containers during DE [destructive exam]." Gunter cautioned that "it is important to continue performing DEs [destructive exams] to assure that corrosion does not increase over time." The revelation of container corrosion and the necessity of destructive examinations represents new information that was not considered in the SA or its cited EISs.

117.    Despite basing their "Radiological Impacts from Repackaging, Staging, and Shipment Preparation" analysis "on operational experience at SRS," Defendants do not address Gunter's statements about the lack of proper surveillance outside of SRS and DOE's observation of corrosion in some containers.

118.    In an attempt to cure the SA's deficiencies, Defendants submitted a Declaration of Steven J. Lawrence in opposition to Nevada's Motion for Injunction Pending Appeal. (ECF No. 74-2). Lawrence tardily attempts to describe the surveillance program at NNSS. Lawrence states only that "an integrated, complex-wide surveillance and monitoring program has been established and implemented." (ECF 74-2 at 3.) But, destructive exams, a key component of the surveillance procedures outlined in the DOE 3013 Standard, will not be completed under the plan proposed in the SA. Lawrence does not contend otherwise. Defendants' late submission of this declaration outside the administrative record is a concession that the surveillance program is pertinent to Defendants' decision but was not discussed in the SA. The SA is inadequate for failing

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

to properly discuss and evaluate the pertinent information about surveillance and storage conditions at NNSS and the DAF.

119.     Moreover, the 2013 SWEIS states that all "[Special Nuclear Material] would be staged and used *in strict compliance with all applicable requirements*." The DOE 3013 Standard represents the applicable requirements for safe storage of 3013 containers. DOE's proposed action in the SA will not be in compliance with the terms of the DOE 3013 Standard due to DOE's failure to conduct random destructive examinations on containers within the NNSS.

120.     The SA impermissibly fails to discuss, examine, or consider pertinent and significant new circumstances and information related to seismic hazards at the DAF. According to the Defense Nuclear Facilities Safety Board, "DOE has not evaluated the impact of the increased seismic hazard [at NNSS] on safety-related structures, systems, and components credited to protect public health and safety during a seismic event." The Defense Nuclear Facilities Safety Board has concluded that "[t]he facility continues to operate without accounting for the increase in seismic hazard" when "a seismically induced high explosive violent reaction could result in unmitigated dose consequences to the offsite public"—a population that is much larger now than when Defendants conducted their prior environmental analyses. Recent earthquakes in the area have heightened the seismic threat. Seismic activity is relevant to environmental concerns because it increases the risk of radiological exposure and disaster.

121.     The SA impermissibly fails to discuss, examine, or consider pertinent and significant new circumstances and information related to the amount of radiological exposure to the environment, workers, and the public.

122.     Without providing a detailed calculation or explanation, the SA proclaims that "[r]adiological impacts to workers for repacking, staging, and shipment preparation are estimated to be 558 millirem per year for individual worker dose." The SA then, again without specificity, estimates latent cancer fatality risks.

123.     The SA states that "[r]adiological impacts to worker health for the proposed action are based on operational experience at SRS."

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

124.     But the SA does not address or consider the information and circumstances contained in Gunter's Declaration even though it is based on his operational experience at SRS. At minimum, Defendants had an obligation to address and explain the apparent contradictions.

125.     Gunter calculates that the "individual operations and radiation control personnel would receive a dose equivalent to 100-200 chest X-Rays … every year for three years" from the transportation and storage of the plutonium at NNSS. This equates to 1,000 to 2,000 millirems of radiation exposure every year for three years.

126.     Gunter opined that the transportation and staging process will expose workers at NNSS to "significant," "needless," and "unnecessary" "levels of radiation." His opinions were not restricted to conditions at SRS. Gunter stated "additional unnecessary exposure would be required of personnel at the alternate storage facility [NNSS] to handle and ultimately dispose of this plutonium."

127.     Gunter's stated radiation amounts and calculation are significantly higher than the amounts estimated or considered in the SA. According to the 2013 SWEIS, the amounts exceed the 500 millirem per year administrative control level that the NNSS site contractor has set for the facility. The higher exposure amounts will alter the latent cancer fatality calculations in the SA. This is especially true given recent population changes in Las Vegas and near NNSS that are also significant new circumstances and information that Defendants failed to consider. Thus, Gunter's information is relevant to environmental and health concerns.

128.     Gunter's radiation calculations are also relevant to environmental concerns because greater radiation amounts increase and prolong radiological exposure to Nevada's atmosphere, air, environment, lands, plants, groundwater, State employees, workers, and public. The radiation causes direct injury to Nevada's state-owned property and invades Nevada's sovereign interests as a State, its quasi-sovereign interests, and its *parens patriae* interests. Increased radiation exacerbates the risk of environmental harm and the risk of harm from accident, intentional sabotage, or natural disaster.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

**3. Defendants failed to otherwise discuss or take a "hard look" at the pertinent circumstances, factors, information or evidence regarding substantial changes to the proposal or the significant new circumstances or information relevant to environmental concerns.**

129. Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

130. NEPA requires federal agencies to take a "hard look" at the environmental effects of their planned action. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).

131. The requisite "hard look" entails, among other things, evaluating all of the relevant factors, data, evidence, information, and providing a detailed and thorough explanation for the conclusions reached and decisions made.

132. The SA does not examine the 40 CFR § 1508.27 "significantly" considerations of both "context" and "intensity," including (but not limited to) "the degree to which the effects on the quality of the human environment are likely to be highly controversial" or "the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."

133. Defendants should have considered the extent to which staging South Carolina's plutonium at NNSS may establish a precedent or represents a decision in principle for future consideration about the remaining plutonium in South Carolina that Defendants must remove by January 2022. Additionally, the plutonium's similarity and the close proximity to the opposed Yucca Mountain Nuclear Waste Repository rendered Defendants' actions highly controversial and inflammatory. Defendants were required to take these circumstances and information into account along with the other significance factors in 40 CFR § 1508.27.

134. For similar reasons, Defendants failed to properly consider the cumulative effects of indefinitely staging South Carolina's plutonium at NNSS. The shipment and staging at NNSS of one-half metric ton of plutonium from SRS cannot be viewed in isolation. 50 U.S.C. §2566(c) requires Defendant to remove the remaining plutonium from South Carolina before January 1, 2022. Accordingly, the law contemplates additional future proposed action that is closely related to the action at issue in this case. Given Defendants' surreptitious actions here, it is reasonably

25

foreseeable that NNSS will be used for future indefinite staging of additional tons of plutonium or radioactive material. The SA does not evaluate these reasonably foreseeable future actions or refer to previous NEPA documents where these cumulative impacts were evaluated.

135.    Defendants also failed to consider "no-action" alternatives with regard to the separate shipments between Pantex and NNSS. The SA states that a "no action alternative would be in violation of the Order of Injunction Relief and would result in the Agency facing contempt of court proceedings." Even if true for shipments between SRS and NNSS, Defendant do not explain the need for the shipments between Pantex and Nevada or justify why a no-action alternative was not considered for shipments between Pantex and NNSS.

136.    There are other alternatives that should have been considered. For example, and without limitation: (1) shipping and staging at Y12 National Security Complex in Oak Ridge, Tennessee; (2) shipping and staging at Sandia National Laboratory in Albuquerque, New Mexico; and (3) shipping and staging at the Kirtland Air Force Base in Albuquerque, New Mexico. Any of these alternatives should pose less risk and less environmental impacts than shipping and staging plutonium at NNSS for eventual shipment to LANL. None of these alternatives are foreclosed by the South Carolina injunction.

137.    Moreover, Defendants "analysis" of the resource areas is conclusory and without data, information, or calculations to support their conclusions. Defendants' analysis lacks quantified or detailed information. Defendants do not show their "work" or reveal their "math." Defendants make unexplained assumptions and jump to decisions without explanation. Defendants' conclusions are mere general statements about "possible effects" or "some risks."

138.    Defendants' sparse explanations do not constitute the necessary "hard look" at the environmental effects of their actions to sustain the SA.

139.    For example, Defendants proclaim that the "the proposed action is not expected to result in radioactive emissions from repacking, staging, and shipment preparation, so there would be no radiological impacts *to the public* from activities at the four sites." (3.2.4.1).

140.    Defendants do not offer any evidence or explanation for why the action is not "expected" to impact the public. Defendants do not engage in any analysis whatsoever to determine

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

26

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

whether the proposed action will, in fact, impact the public. Nor do Defendants address Gunter's Declaration.

141.     Likewise, Defendants baldly state, for radiological impacts from shipments (3.2.4.2), that "potential impacts to the crew and the public for the proposed action represent a minimal increase from the analysis in the Final Surplus Plutonium Disposition SEIS (DOE 2015; Table E-8) and the NNSS SWEIS, Table 3-7 (DOE 2013; Table E-13)." The SA also declares that "[p]otential radiological impacts represent a minimal increase from existing analyses in the NNSS SWEIS (DOE 2013) and the Final Plutonium Surplus Disposition SEIS (DOE 2015)."

142.     Yet Defendants do not explain or offer evidence for why the increases are "minimal" or state the baseline against which to measure. Defendants merely assert their conclusions devoid of supporting data, facts, or analysis.

143.     Defendants do not adequately demonstrate or show how the resource areas were analyzed or were addressed in prior NEPA documents.

144.     Defendants' other charts do not support or explain Defendants' conclusions because they are based on unexplained or undisclosed assumptions. Additionally, some of the listings in the tables apply only to transporting low-level radioactive waste, not Pu-239 so this information does not support Defendants' conclusions.

145.     Defendants failure to provide supporting evidence, data, or explanation is particularly troubling because Defendants' Table 3-[2] acknowledges that there are "Radiological Impacts to Public and Worker Health," including for transportation. The Table 3-2 columns for NNSS state that there are "impacts from repacking and inspections" and "impacts from proximity to transport vehicle." Notably, unlike other nearby columns, Table 3-2 does not describe these impacts as "no impact," "negligible," or "minor," or "bounded by existing NEPA analysis." There is no minimizing qualifier on the NNSS impacts.

146.     Based upon Table 3-2, the Radiological Impacts to the Public and Worker Health, including from transportation, are not "bounded by existing NEPA analysis."

147.     Defendants do not cogently reconcile the conflicting statements in the SA.

27

148.    Defendants admit that the proposed actions of transporting and storing South Carolina's plutonium at NNSS increase the radiological impacts on workers and the public but Defendants fail to provide any data demonstrating the amount of the increase or justifying their conclusion that the increase is "minimal." Their failure to do so flunks NEPA's "hard look requirement."

149.    Defendants did not consider or examine the relevant data or adequately articulate a satisfactory explanation for its decision and action, including a rational connection between the facts and the choice made.

150.    Defendants do not adequately demonstrate or show that the proposed action constitutes no substantial change from prior actions and they do not establish how there is no new significant circumstance or information relevant to environmental concerns. The SA does not discuss the pertinent circumstances and does not provide sufficient information.

151.    Defendants' conclusions in the SA are not supported by substantial evidence while, on the contrary, there is substantial evidence that Defendants' actions constitute a substantial change to the proposal, significantly affect the quality of the human environment, and present significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

152.    Defendants' failure to comply with NEPA, Council on Environmental Quality's implementing regulations, DOE's own environmental rules, and the APA, have harmed Nevada's interests because these violations led to an uninformed decision-making process and deprived Nevada of critical information needed to protect itself and its citizens. Defendants would not have acted under the SA or would have taken different action if they were fully informed.

**H.    Indefinitely Staging South Carolina's Plutonium at NNSS Injures Nevada.**

153.    Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

154.    The SA acknowledges that the indefinite staging of the South Carolina plutonium at NNSS exposes Nevada's environment and citizens to increased radiation.

155.    The Declaration of Gunter, DOE's employee, characterized the levels of radiation as "significant."

156.    Nevada has a strong interest in protecting the health and safety of its citizens from radiological injuries and in protecting its lands and groundwater from radioactive contamination. Defendants' indefinite staging of plutonium at NNSS under the SA will result in increased radiation doses to Nevada's state-owned property, biosphere, State employees, and citizens. In some circumstances, the radiation from the plutonium would lead to contamination of lands and groundwater of Nevada with radioactive material. The long-term, indefinite storage of plutonium in the conditions described-above certainly increases the risk of environmental contamination and disaster, either accidental or intentional.

157.    Nevada's sovereign interests are injured because, under Nevada law, the State holds the land and water resources within its borders in trust for the benefit of the public and People of the State. NRS 321.597; NRS 533.025; NRS 534.020.

158.    Nevada has an independent interest in protecting and preserving all the earth and air within its boundaries, domain, and territory.

159.    NNSS and the DAF are located within Nevada's sovereign borders and the increased radiation emanates from those facilities into the State's ecosystem. The harm from increased radiation is occurring now and is ongoing while the plutonium remains at NNSS. The presence of the plutonium and increased radiation also increases the risk of future harm to natural resources and human health.

160.    Nevada owns sovereign lands near NNSS, including adjacent highways S.R. 160, S.R. 373, and the Nevada owned and maintained U.S. 95. The increased radiation from the plutonium affects these routes and property. State workers, state officials, and the public travel on these roads and will be exposed to increased radiation. The increased radiation lessens the value of these areas—functionally, recreationally, professionally, economically, and aesthetically—as public and private travelers are less likely to use these highways due to the presence of increased radiation.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

161.    As a nearby landowner, Nevada is directly damaged by the spill-over effects from the increased radiation that South Carolina's plutonium causes at NNSS.

162.    The increased radiation exposure is an ongoing, tangible, and unreasonable invasion of Nevada's rights to use its property and to have a clean and healthy environment. The radiation pollutes Nevada's environment and atmosphere.

163.    The increased radiation also harms the communities close to NNSS. The nearest community to the NNSS is Amargosa Valley, located about 2 miles south of the NNSS, with a population of 1,400. Other nearby Nevada communities include Indian Springs (16 miles, population 1,400), Beatty (17 miles, population 800), Pahrump (26 miles, population 38,200) and Alamo (42 miles, population 460).

164.    Defendants' 2013 SWEIS acknowledges that "[t]here are other urban and residential land uses outside of and adjacent to the NNSS in the Pahrump Valley (about 22 miles southwest of the NNSS) which is the largest populated area near the NNSS."

165.    Defendants admit in the 2013 SWEIS that "[r]eleases of radionuclides to the environment from NNSS operations provide another potential source of radiation exposure to individuals in the vicinity of the NNSS."

166.    The increased radiation negatively affects the State's and public's use and enjoyment of their property, resources, and assets near NNSS.

167.    Heightened exposure to plutonium and radiation increases the level of cancer and fatality risk to State workers, the public, and NNSS workers.

168.    The contamination and risk of harmful health effects are not limited to those individuals that work at NNSS. If contaminated, NNSS workers can carry radioactive material off-site on their persons, clothing, and vehicles and transfer it to members of the public. Moreover, State employees traveling and working nearby are exposed to the increased radiation.

169.    The presence of increased radiation and plutonium imposes additional burdens on Nevada's first responders and their duties to keep Nevadans safe and healthy.

170.    Accidents, if they occur, will impose severe burdens on accident responders, including local, county, and state personnel. Local, county, and state responders will be exposed to

radiation and possibly other hazards, and local, county, and state governments will incur costs related to emergency response, health care for responders who were exposed to radiation, and clean-up.

171.    Tax revenues will likely decline as people planning trips to Nevada and the City of Las Vegas will cancel them for fear of radiation exposure.

172.    NNSS sits on top of ten hydrographic basins (Mercury Valley, Rock Valley, Yucca Flat, Frenchman Flat, Buckboard Mesa, Jackass Flats, Oasis Valley, Gold Flat, Kawich Valley, and Emigrant Valley). NNSS is located within the Death Valley regional groundwater flow system that includes many aquifers and aquitards. NNSS also spans three groundwater subbasins. The Ash Meadows subbasin flows toward the sensitive Ash Meadows National Wildlife Refuge where the endangered Devils Hole pupfish lives.

173.    Defendants recognized in the 2013 SWEIS that "any activity that may affect groundwater on the NNSS has the potential to affect groundwater off the NNSS." Indeed, DOE's monitoring has detected contaminated groundwater in a well outside the NNSS boundary. Even though DOE does not currently believe that this contamination has spread to the public water supply, it shows that radioactive contamination does not stop at the NNSS fence.

174.    Defendants' failure to comply with NEPA has also inflicted procedural and informational injury on Nevada. The State uses the information gathering process of NEPA to contribute facts and data to the Federal Government's decision-making process and to voice Nevadans' concerns. Furthermore, the State uses the NEPA process to discover and learn the information necessary to protect Nevada's environment and citizens. The State uses the information from NEPA processes to inform State officials and first responders. By foregoing the required NEPA process, Defendants have irretrievably deprived Nevada of this information and its chance to contribute.

175.    The increased radiation from the indefinitely staged plutonium at NNSS impacts, damages, and threatens Nevada's environment, lands, property, groundwater, resources, and citizens. In addition to the direct injury to Nevada's own sovereign interests, the increased radiation from the indefinite storage of South Carolina's plutonium at NNSS harms Nevada's quasi-

sovereign and *parens patriae* interests in the general health, physical, and economic well-being of its citizens.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Defendants Violated 42 U.S.C. § 4332(C)).**

176. Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

177. The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Similarly, the Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action, findings, or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." 5 U.S.C. § 706(2).

178. 42 U.S.C. § 4332(C) requires federal agencies to complete an "Environmental Impact Statement" for "major Federal actions significantly affecting the quality of the human environment."

179. As alleged herein, Defendants actions—including but not limited to the indefinite staging of South Carolina's plutonium at NNSS—constitutes major federal action significantly affecting the quality of the human environment.

180. However, Defendants did not complete an environmental impact statement as required. Therefore, the Supplement Analysis and Defendants' actions are not in accordance with the law and are without observance of the procedure required by law. The Court should declare that Defendants have violated NEPA and enjoin them as prayed for below.

### SECOND CAUSE OF ACTION
**(Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Defendants Violated 40 CFR § 1502.9(c)(1)).**

181. Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

182.    The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Similarly, the Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action, findings, or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." 5 U.S.C. § 706(2).

183.    40 CFR § 1502.9(c)(1)  requires federal agencies to prepare a supplemental environmental impact statement if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

184.    As alleged herein, the SA and Defendants' action represent substantial changes in the proposed action and there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

185.    However, Defendants did not complete a supplemental environmental impact statement as required. Nor did Defendants consider all of the "significantly" factors from 40 CFR § 1508.27. Therefore, the Supplement Analysis and Defendants' actions are not in accordance with the law and are without observance of the procedure required by law. The Court should declare that Defendants have violated NEPA and enjoin them as prayed for below.

**THIRD CAUSE OF ACTION**
**(Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Defendants**
**Violated 40 CFR § 1501.4(b) and 40 CFR § 1508.9).**

186.    Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

187.    The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Similarly, the Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action, findings, or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." 5 U.S.C. § 706(2).

188.   If it is unclear whether an EIS is necessary, an agency is obliged to complete an environmental assessment. 40 CFR § 1501.4(a) states: [i]n determining whether to prepare an environmental impact statement the Federal agency shall: Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which: (1) Normally requires an environmental impact statement, or (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion)." If the proposed action is not covered by this section, the agency must prepare an environmental assessment. 40 CFR § 1501.4(b).

189.   As alleged herein, the SA admits that it was "unclear whether or not an EIS supplement is required …." However, Defendants did not complete an environmental assessment as required. Instead, Defendants completed a "supplement analysis" in circumstances in which it should have completed an environmental assessment. A supplement analysis is not recognized under NEPA or its implementing regulations. *See* 40 CFR § 1508.10 (defining NEPA document). The supplement analysis process in 10 CFR § 1021.314 is unlawful.

190.   Defendants did not consider all of the "significantly" factors from 40 CFR § 1508.27

191.   Therefore, the Supplement Analysis and Defendants' actions are not in accordance with the law and are without observance of the procedure required by law. The Court should declare that Defendants have violated NEPA and enjoin them as prayed for below.

**FOURTH CAUSE OF ACTION**
**(Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Defendants Violated 10 CFR § 1021.314).**

192.   Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

193.   The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Similarly, the Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action, findings, or conclusions that are, among other

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." 5 U.S.C. § 706(2).

194.    10 CFR § 1021.314(a) requires DOE to "prepare a supplemental EIS if there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns."

195.    10 CFR § 1021.3149(c) provides that "[w]hen it is unclear whether or not an EIS supplement is required, DOE shall prepare a Supplement Analysis. (1) The Supplement Analysis shall discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS, pursuant to 40 CFR § 1502.9(c). (2) The Supplement Analysis shall contain sufficient information for DOE to determine whether: (i) An existing EIS should be supplemented; (ii) A new EIS should be prepared; or (iii) No further NEPA documentation is required."

196.    As alleged herein, Defendants' actions represent substantial changes to the proposed action and there are significant new circumstances or information relevant to environmental concerns, as discussed in 40 CFR § 1502.9(c)(1). However, Defendants did not prepare a supplemental EIS.

197.    Additionally, as alleged here, the SA does not discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS, pursuant to 40 CFR § 1502.9(c) and does not contain sufficient information for DOE to determine whether an existing EIS should be supplemented, a new EIS should be prepared, or no further NEPA documentation is required.

198.    Defendants did not discuss or consider all of the "significantly" factors from 40 CFR § 1508.27.

199.    Therefore, the Supplement Analysis and Defendants' actions are not in accordance with the law and are without observance of the procedure required by law. The Court should declare that Defendants have violated NEPA and enjoin them as prayed for below.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

### FIFTH CAUSE OF ACTION
#### (Federal Common Law Public Nuisance).

200.   Nevada hereby repeats, realleges, and incorporates all of the allegations contained in the preceding Paragraphs as though fully set forth herein.

201.   Federal common law recognizes a public nuisance claim against the federal government and its agencies. *See, e.g., Michigan v. U.S. Army Corps of Engineers,* 758 F.3d 892, 900-02 (7th Cir. 2014). "States may bring a federal common law [public nuisance] claim to vindicate not only their interests in state property or property held in public trusts, but also in a quasi-sovereign capacity to challenge activity 'harmful to their citizens' health and welfare." *Id.* at 900.

202.   In the Administrative Procedure Act, 5 U.S.C. § 702, Congress has waived the Federal Government's sovereign immunity to federal common law public nuisance claims seeking injunctive relief. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 776 (7th Cir. 2011).

203.   The Restatement (Second) of Torts has been the common reference point for courts considering federal common law public nuisance claims. *Id.* at 80-81; *Michigan*, 758 F.3d at 900.

204.   The Restatement (Second) of Torts §821B defines a public nuisance as "an unreasonable interference with a right common to the general public" involving conduct that is "a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience." Courts also consider whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right. *Id.*; *Michigan*, 758 F.3d at 900.

205.   Agency action that reflects only the agency's choice of a particular course of action to implement a policy is not *per se* immune from a public nuisance claim under the federal common law. *Michigan*, 758 F.3d at 901-02.

206.   As alleged herein, the increased radiation emanating from the South Carolina plutonium at the DAF in NNSS constitutes an unreasonable interference with rights common to the public and poses a significant interference with the public health, public safety, public peace, public comfort, and public convenience.

207. The manner in which Defendants' are operating the DAF at NNSS, including but not limited to the lack of proper storage conditions, surveillance program, and testing creates a current and imminent public nuisance. The operating conditions at the DAF in NNSS shows that Defendants cannot or will not respond to urgent threats if and when they arise.

208. Defendants' current method of operating alleged herein permits, and will permit, increased radiation to contaminate State employees, NNSS workers, and the public. Defendants' current method of operating permits, and will permit, increased radiation to be released into Nevada's environment, onto public and private lands, and into the State's groundwater and natural resources.

209. The damage and injury from the increased radiation emanating from NNSS is ongoing, continuing, and poses a continuing threat of future injury. The increased radiation is being released currently, will continue to be released, and Defendants' operating conditions render it likely that additional radiation will be released in the event of an accident or intentional act. The increased radiation has produced a permanent, long-lasting, and significant effect on the public right.

210. Congress has not displaced the common law in this area and has not adopted a statute that speaks directly to the questions at issue here. Defendants' conduct is not required by statute or regulation. Congress has not directed that Defendants *must* indefinitely store South Carolina's plutonium at NNSS. DOE has not adopted a regulation requiring Defendants to indefinitely stage South Carolina's plutonium at NNSS.

211. The public nuisance alleged herein has damaged, and will continue to damage, Nevada's sovereign and quasi-sovereign interests. An injunction should issue abating the nuisance and ordering Defendants to remove the South Carolina plutonium from the State.[4]

---

[4]    On October 21, 2019, the Court denied Nevada's Motion for Leave to File an Amended Complaint to the extent that the proposed complaint included a sixth cause of action under the Price-Anderson Act. (ECF No. 136.) As a result of the Court's ruling, this Amended Complaint does not include the Price-Anderson Act sixth cause of action. However, by this reference, Nevada stands on that claim and, to avoid waiver or abandonment, preserves its right to appeal the denial of its request for leave to amend to include the sixth cause of action under the Price-Anderson Act.

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1

**<u>PRAYER FOR RELIEF</u>**

2

WHEREFORE, Plaintiff the State of Nevada prays for judgment as follows:

3

1.     A declaration and order that the Defendants' actions violate NEPA, and the Council

4

on Environmental Quality and DOE implementing regulations;

5

2.     An order setting aside and vacating the SA;

6

3.     For temporary, preliminary, and permanent injunctive relief prohibiting Defendants

7

from authorizing or allowing or otherwise acting to ship any plutonium under the

8

SA until Defendants properly comply in full with NEPA;

9

4.     For temporary, preliminary, and permanent injunctive relief ordering Defendants to

10

remove any plutonium shipped to NNSS under the SA;

11

5.     For an award of reasonable costs and attorneys' fees; and

12

6.     For any additional relief this Court deems just and proper.

13

DATED this 23rd day of October 2019.

14

15

By:   ___/s/ Jordan T. Smith___
      Daniel P. Nubel (Bar No. 13553)

16

*Deputy Attorney General*
OFFICE OF THE NEVADA ATTORNEY GENERAL 100 N.
Carson Street

17

Carson City, Nevada 89701

18

James J. Pisanelli., Bar No. 4027
Todd L. Bice, Bar No. 4534

19

Jordan T. Smith, Bar No. 12097
Emily Buchwald, Bar No. 13442

20

PISANELLI BICE PLLC
400 South 7th Street, Suite 300

21

Las Vegas, Nevada 89101
*Special Deputy Attorneys General*

22

Martin G. Malsch, Esq.

23

EGAN, FITZPATRICK, MALSCH &
LAWRENCE, PLLC

24

1776 K Street N.W., Suite 200
Washington, D.C. 20006

25

*Special Deputy Attorneys General*

26

27

28

PISANELLI BICE PLLC
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

38

1

## <u>CERTIFICATE OF SERVICE</u>

2      I HEREBY CERTIFY that I am an employee of PISANELLI BICE PLLC and that, on this

3   23rd day of October, 2019, I caused to be sent via email and the United States Postal Service,

4   postage paid, a true and correct copy of the above and foregoing **AMENDED COMPLAINT** to

5   the following:

6   Jean E. Williams
    David L. Negri,
7   U.S. Department of Justice
    Environment and Natural Resources Div.
8   c/o U.S. Attorney's Office
    800 Park Blvd., # 600
9   Boise, Idaho 83712
    (208) 334-1936
10  david.negri@usdoj.gov

11  John P. Desmond
    Brian R. Irvine
12  DICKINSON WRIGHT PLLC
    100 West Liberty Street
13  Suite 940
    Reno, Nevada 89501
14  jdesmond@dickinsonwright.com
    birvine@dickinsonwright.com
15
    Robert D. Cook, Solicitor General Office of the Attorney General
16  Post Office Box 11549
    Columbia, South Carolina 29211-1549
17  bcook@scag.gov

18  Randolph R. Lowell
    WILLOUGHBY & HOEFER, P.A.
19  133 River Landing Drive, Suite 200
    Charleston, South Carolina 29492
20  rlowell@willoughbyhoefer.com

21

22                              _____/s/ Kimberly Peets_____
                                An employee of PISANELLI BICE PLLC

23

24

25

26

27

28